[No. 38475-9-I.    Division One.    February 12, 1999.]

MAEVE DOOLITTLE, *Appellant*, v. SMALL TRIBES OF WESTERN WASHINGTON, INC., ET AL., *Respondents*.

*George W. Akers* of *Montgomery, Purdue, Blankinship & Austin, P.L.L.C.*, for appellant.

*Patricia E. Anderson*; *Walter G. Palmer, Jr.*, and *Peggy Sue Juergens* of *Walter G. Palmer, Inc., P.S.*; and *Carol J. Molchior* of *Madden & Crockett, L.L.P.*, for respondents.

KENNEDY, C.J. — Maeve Doolittle appeals the trial court's order on summary judgment of March 15, 1996, dismissing her claim against Small Tribes of Western Washington (STOWW) for wrongful termination of employment. Doolittle claims that she was terminated in violation of provisions of STOWW's personnel policy manual providing for termination for cause, assuring employees of reasonable job security and providing for a system of progressive discipline. The policy manual contains a procedure for modification of STOWW's personnel policies. A month before the termination of Doolittle's employment, STOWW issued a memorandum addressed to all employees notifying them that the progressive discipline procedures had been

rescinded and that nothing in the personnel policies was intended to be a part of the employment relationship, or to amount to promises of specific treatment, or to be construed as a contract. STOWW concedes on appeal that it did not follow the procedure contained in the manual governing modification of personnel policies but argues that this is immaterial in that Doolittle admittedly received a copy of the memorandum and continued to work instead of resigning immediately. STOWW contends that under Washington case law, this ends the inquiry and that it is entitled to summary judgment as a matter of law. We disagree, and hold that under the facts contained in the record for this appeal, a rational, fair-minded trier of fact could determine that STOWW breached its employment contract with Doolittle by failing to follow the set procedure for amending its personnel policies. Accordingly, we reverse the dismissal of Doolittle's wrongful termination claim against STOWW and remand for such further proceedings as shall be consistent with this opinion.[1]

Respondent/cross-appellant The Sells Group, P.S. (Sells), won dismissal of Doolittle's defamation claim by order of summary judgment entered on September 8, 1995, six months before the entry of final judgment.[2] Sells did not file its cost bill in the time intervening between the dismissal of the defamation claim and entry of final judgment, nor within 10 days following entry of final judgment. Sells cross-appeals, arguing that it was precluded by law from filing its cost bill during the time intervening between its dismissal from the case and the entry of final judgment, and that the trial court erroneously denied Sells any opportunity to file a cost bill by failing to give Sells notice of

[1]The trial court also dismissed Doolittle's wrongful termination claim against the members of STOWW's board of directors. Doolittle has not assigned error to the dismissal of that claim, and has devoted no section of her opening or reply briefs to the dismissal of that claim. Accordingly, we summarily affirm that portion of the summary judgment order entered on March 15, 1996, dismissing the wrongful termination claim against the members of the board of directors.

[2]Doolittle appeals the dismissal of her claim for defamation against Sells. We affirm the dismissal of this claim in the unpublished portion of this opinion.

entry of final judgment.[3] We hold that Sells was not precluded from filing its cost bill during the time intervening between dismissal of Doolittle's claim against Sells and dismissal of Doolittle's claims against the remaining defendants and that the trial court was not required to give Sells notice of entry of final judgment.

## FACTS

STOWW is a nonprofit corporation composed of Native American tribes organized to promote and enhance the principles of tribal self-determination and sovereignty. The record contains the following description of STOWW's function: "In a nutshell, STOWW writes grants and administers programs for small, member tribes who alone would not have the resources to do the same on an individual tribal basis." Clerk's Papers at 576. STOWW receives in excess of $100,000 in annual federal financial assistance; accordingly, it must periodically undergo independent audits to ensure compliance with federal regulations regarding the handling and expenditure of federal funds.

In May 1993, STOWW hired Maeve Doolittle to serve as its controller. In July 1993, STOWW retained Ronald Sells and The Sells Group, P.S., to perform an audit consistent with the requirements of OMB Circular A-133 for nonprofit organizations receiving $100,000 or more of federal financial assistance. Sells' ensuing reports to STOWW criticized Doolittle's qualifications to serve as a controller for an organization receiving federal funding. Sells also criticized STOWW for failing to define its own missions and objectives, for failing to define the role and responsibilities of its executive director, and for failing to write a job description for its controller, before hiring Doolittle, that took into account the federal regulations and professional qualifications for a person holding that position.

---

[3]The Sells Group also cross-appeals the trial court's refusal to grant sanctions against Doolittle under CR 11 for bringing the defamation claim. We affirm the trial court's denial of CR 11 sanctions in the unpublished portion of this opinion.

The record reflects that Sells' criticism of STOWW was justified. Doolittle responded to an advertisement calling for a head bookkeeper, a position for which she was seemingly qualified by virtue of her previous experience; after she was hired she learned that her job title was actually that of a controller, a title she had never held and for which she had never applied, at STOWW or anywhere else. STOWW's former executive director and controller had each resigned simultaneously before Doolittle was hired. STOWW had two different acting executive directors during Doolittle's tenure. Doolittle received conflicting information with respect to the role of the acting executive director and her own role in dealing with the auditor. STOWW was changing from a manual system of accounts to a computerized system when Doolittle came on board. The process was made more difficult than would ordinarily be the case because ledgers had not been closed for many months before Doolittle was hired and bank accounts had not been reconciled. On two occasions, Doolittle was told she was being "laid off" only to be told, later the same day, that she was still on the job. Not surprisingly, given these chaotic working conditions, conflicts developed between Doolittle, the first of the two acting executive directors who served during her tenure, the chair of the board of directors, the assistant bookkeeper, and Ronald Sells, the independent auditor. It is fair to conclude from the evidence in the record that during the first several months of her employment, Doolittle became a thorn in the side of several influential people at STOWW.

Doolittle's relationship with her employer was already tenuous before Sells commenced the audit; after Sells' interim reports to the board, the relationship deteriorated further. According to Doolittle's testimony at deposition, the chair of STOWW's board of directors issued a written directive to the second of the two acting executive directors instructing him to fire Doolittle, based on Sells' report that Doolittle had failed to file a federal tax return that was already overdue when Doolittle was hired; Sells' report stated that Doolittle failed to file the return either because she

was too busy or did not know how to prepare the return. Doolittle testified that the acting executive director declined to fire her; instead, he specifically requested her to remain on the job.

When Doolittle was hired, she was given STOWW's personnel policy manual that had been in effect since August 20, 1981, a period of some 12 years. The manual provides for an initial period of probation during which new employees may be terminated at will. After an employee completes probation, the manual provides for termination for cause and contains the following assurance: "Employees shall be assured reasonable job security so long as the requirements of the job are met, the employee's conduct is acceptable and the work or level of program funding is continued." Clerk's Papers at 604. Doolittle testified at deposition that she completed probation and was granted regular employment status by the second of STOWW's acting executive directors, at the end of August 1993.

The policy manual proclaims STOWW to be a Native American preference employer in accord with federal laws governing federal contracts with or grants to Native American organizations or for the benefit of Native Americans. Before its amendment, the manual also provided for a system of progressive discipline with penalties ranging from warning letters to immediate termination, depending upon the gravity of employee misconduct. This section of the manual, entitled "Guide to Disciplinary Action," contained a table of potential employee infractions and suggested penalties. Although numerous of the potential infractions are of the sort any employer might be required to address, read in the context of the policy manual as a whole and STOWW's purposes as described in the record, the "Guide to Disciplinary Action" appears to reflect STOWW's mission of promoting and enhancing the principles of tribal self-determination and sovereignty by providing its preferred class of employees with generous opportunity to cure any infractions and to comply with STOWW's stated

directive, also contained in the policy manual, that "[e]ffort shall be made by all employees of STOWW, Inc., to encourage and maintain satisfactory employee-management relationships in order to achieve high productivity, and establish the highest possible level of employee efficiency and morale." Clerk's Papers at 603.

The policy manual sets forth the following procedure for modification of personnel policies:

When the need for a new or revised policy or procedure is indicated, it will be referred to the Personnel Committee. If it is decided by the Personnel Committee that such a policy or revision is desirable, the Committee will outline or suggest the principal points that should be covered. The staff will assist the Committee in preparing a preliminary draft of the policy and distribute it to members of the Board for their consideration.

The Board will review the draft and provide the appropriate direction for preparation to all tribes and all Board members in ample time to provide adequate study before being voted on by the Board. All member tribes and all staff members, to include all new employees, will be provided with an up-to-date copy of the Personnel Policies Manual, and all changes thereto.

Clerk's Papers at 580-81.

On March 2, 1994, STOWW issued a memorandum addressed to all STOWW employees, stating:

The following language is added to the first paragraph of the introduction on page one of the personnel policies:

Nothing contained in these personnel policies is intended to be part of the employment relationship and are simply general statements of company policy. These personnel policies do not amount to promises of specific treatment and are merely general statements of company policy and are not binding on STOWW. These policies are not to be construed as a contract or a legal document. STOWW reserves the right to amend, supplement or rescind any provisions of this handbook as it deems appropriate in its sole and absolute discretion.

In addition, paragraph H 5, "Guide to Disciplinary Action" beginning on page 38 and continuing through page 44 is omitted from the personnel policies manual.

Clerk's Papers at 629.

STOWW admitted at oral argument for this appeal that it did not follow the modification procedures set forth in the policy manual before adopting this amendment.[4] Doolittle admitted at deposition that she received the memorandum on March 6, 1994, and that she signed the accompanying acknowledgment, but stated that she did not return the signed acknowledgment to STOWW because she did not agree with the memorandum. Doolittle continued working at STOWW until her employment ended a month later, on or about April 6, 1994.[5]

On July 11, 1994, Doolittle brought suit against STOWW and its individual directors alleging wrongful termination. She also asserted a claim for defamation against STOWW and its directors and against The Sells Group for comments made about her during the course of Sells' audit. The defendants brought motions for summary judgment; on September 8, 1995, Judge Deborah Fleck entered summary judgment dismissing Doolittle's defamation claims against STOWW, the directors and Sells. On March 15, 1996, Judge Mary Brucker entered summary judgment dismissing Doolittle's wrongful termination claims against STOWW

---

[4]The record does not affirmatively reflect that the board of directors formally adopted the amendment. However, Doolittle does not deny that the board did so; she complains only that the board failed to follow the procedures set down in the policy manual before adopting the amendment.

[5]Still at issue between the parties is whether Doolittle resigned or was fired. STOWW claims that she resigned at STOWW's executive committee meeting on April 6, 1994. Doolittle denies she resigned at that meeting or at any other time. The record indicates that Doolittle received unemployment compensation following the termination of her employment. This being a review of an order of summary judgment, we will assume for the purposes of our ruling that Doolittle was fired, in accord with the usual standard of review of summary judgment proceedings.

and its directors. This timely appeal and cross-appeal followed.

## DISCUSSION

### I. Standard of Review

When reviewing an order granting summary judgment, an appellate court engages in the same inquiry as the trial court. *Failor's Pharmacy v. Department of Soc. & Health Servs.*, 125 Wn.2d 488, 493, 886 P.2d 147 (1994); *Fisher v. Aldi Tire, Inc.*, 78 Wn. App. 902, 906, 902 P.2d 166 (1995), *review denied*, 128 Wn.2d 1025 (1996). All facts and reasonable inferences must be considered in the light most favorable to the nonmoving party. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). This court will affirm an order granting summary judgment if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c).

### II. Wrongful Termination Claim

Doolittle contends that the trial court erred in ordering summary judgment dismissing her wrongful termination claim. She contends that when STOWW modified its personnel policies through a procedure different from that set forth in the manual, and when STOWW "ignored" the manual in its dealings with her, it breached its employment contract with her, entitling her to recovery. STOWW does not contend that Doolittle was discharged for cause, arguing instead that following the modification of its personnel policies Doolittle was subject to termination at will.

### Effectiveness of Disclaimer/Rescission

STOWW does not deny Doolittle's contention on appeal that the policy manual at issue in this case, prior to the modification, created an atmosphere of job security and fair treatment with promises of specific treatment in specific situations. We have examined the manual and conclude that, at the very least, a rational, fair-minded trier of fact could find that the policies contained in the manual

changed what would otherwise have been employment terminable at will to employment terminable for cause, upon completion of the initial period of probation. We also find sufficient evidence in the record from which a rational, fair-minded trier of fact could find that Doolittle accepted employment at STOWW and remained on the job, in spite of chaotic and hostile working conditions, in justifiable reliance upon the promises of job security contained in the manual, prior to its amendment.

It is well settled under Washington case law that an employer may unilaterally amend or revoke personnel policies or disciplinary procedures established in an employee handbook, and may disclaim the contractual nature of what might otherwise appear to be enforceable promises contained in such handbooks. *E.g.*, *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 434, 815 P.2d 1362 (1991); *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 526, 826 P.2d 664 (1992). Any such disclaimer "must state in a conspicuous manner that nothing contained in the handbook, manual, or similar document is intended to be part of the employment relationship and that such statements are instead simply general statements of company policy." *Swanson*, 118 Wn.2d at 527 (citing *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 230, 685 P.2d 1081 (1984)). "However, an employer's unilateral change in policy will not be effective until employees receive reasonable notice of the change." *Gaglidari*, 117 Wn.2d at 434 (citing *Bankey v. Storer Broad. Co.*, 432 Mich. 438, 443 N.W.2d 112, 113 (1989)). The employer need not reserve the right to unilaterally change its policy from one of discharge for cause to one of termination at will, so long as the employer gives affected employees reasonable notice of the change in policy. *Id.*

■ This being so, STOWW argues that because the record demonstrates that Doolittle received notice of the policy change and remained on the job despite her lack of agreement with the terms of the memorandum, and because the memorandum clearly and conspicuously revokes the system of progressive discipline and disclaims the enforceability of

the provisions assuring reasonable job security and termination for cause, the inquiry should end, and this court should simply affirm the trial court's summary judgment without further analysis. In so arguing, STOWW overlooks an important distinction between the handbooks and underlying facts in the Washington cases cited above and the handbook and underlying facts in this case: STOWW's handbook contains a procedure for revising the policies and progressive discipline procedures contained in the handbook; moreover, STOWW admits it failed to follow the procedure.

A rational trier of fact could determine that STOWW effectively contracted itself out of the protections of *Gaglidari*, that is, a rational trier of fact could determine that the procedure for modifying personnel policies and procedures contained in STOWW's policy manual was intended to assure employees that STOWW would not arbitrarily amend the handbook to remove their job security and, instead, that any such changes in policy would occur only after advance notification to STOWW's member tribes with ample opportunity for tribal feedback to the board of directors, in order to protect the interests of Native Americans who are given preference for employment at STOWW, and whose job security presumably is of great interest to STOWW's member tribes.[6] Although Doolittle does not appear from the record to be Native American, to the extent

---

[6]Although the record is less than crystal clear, it is also possible that the modification procedure may relate to STOWW's federal funding and be designed to ensure that no federal regulation is inadvertently violated by a change in personnel policies without adequate study. The record contains a sample grant application form that states, in pertinent part, that the applicant certifies that it: "[w]ill comply with the Intergovernmental Personnel Act of 1970 (42 U.S.C. §§ 4728-4763) relating to prescribed standards for merit systems for programs funded under one of the nineteen statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration (5 C.F.R. 900, Subpart F)." Clerk's Papers at 528. Although we are unable to determine from Doolittle's briefing with respect to the application form and the federal regulations to which it refers whether the purported disclaimer and revocation of certain of the personnel policies actually violated any applicable federal regulation governing applicants for federal funds, the fact that STOWW's grant application forms require it to certify that it has a merit system in place for its personnel demonstrates the importance of careful study before any changes to the personnel policies.

that she relied upon the contractual promises contained in the handbook, she is entitled to the same protections as the Native American employees:

> "While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. . . . It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices . . . [the policies] established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation *'instinct with an obligation.'* "

*Thompson*, 102 Wn.2d at 229-30 (emphasis added) (quoting *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 613, 292 N.W.2d 880, 892 (1980)).

It is unnecessary for us to decide, in order to dispose of this appeal, whether an employer, once unilaterally but nevertheless contractually binding itself to a set procedure for modifying its employee handbook, may *ever* effectively modify the handbook without either following that set procedure or amending or rescinding the set procedure and giving its employees reasonable notice of that fact, in advance of making its desired changes in other personnel policies and procedures more directly affecting job security. Although any such requirement would seem to be reason-

---

Doolittle claims that the sample application form provides evidence that STOWW's disclaimer was negated by its subsequent inconsistent representations and practices in continuing to apply for federal funds in support of its programs, using grant application forms such as the sample contained in the record. We reject this premise. No evidence in the record shows that the federal regulations referred to in the application form were communicated to the employees; moreover, no evidence shows that the employees relied upon representations made in the grant applications as part of their employment relationship. Thus, the representations are distinguishable from those in which courts have found disclaimers to have been negated by inconsistent employer representations. *See Swanson,* 118 Wn.2d 532-35.

able, the parties' briefing does not address the issue and our ruling here is more narrow. In sum, we hold that where an employer issues an employee handbook that creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations, and expressly provides in that same handbook that changes in the employer's policies and procedures assuring job security will not be made without following a set procedure that in and of itself is designed to assure employees that changes affecting their job security will not be made arbitrarily but only after consultation with the employer's shareholders or other equivalent bodies, and the employer then unilaterally removes job security without following the prescribed procedure, a trier of fact can properly find a breach of the employment contract as to an employee who has justifiably relied on the promises made in the handbook in accepting or retaining employment.

Accordingly, we reverse the summary judgment order in favor of STOWW, reinstate Doolittle's wrongful termination claim against STOWW and remand for such further proceedings as shall be consistent with this opinion.

*III. Costs and Reasonable Expenses*

In its cross-appeal, Sells contends that by failing to give it notice of entry of the final judgment entered on March 15, 1996, the trial court erroneously denied it the right to file a cost bill under RCW 4.84.030 and to seek an award of reasonable expenses under RCW 4.84.185.

Under RCW 4.84.090, a cost bill must be served and filed within 10 days after the judgment. Citing *Thompson v. Seattle Park Co.*, 94 Wash. 539, 162 P. 994 (1917), Sells contends that the term "judgment" refers to the time when *final* judgment has been entered in a case. Because final judgment was not entered in this case until March 15, 1996, and because the court failed to give it notice of entry of the final judgment, Sells contends that it was precluded from filing its cost bill within the time parameters of RCW 4.84.090.

Sells' argument is based on a faulty premise. In *Thomp-*

*son,* the court was asked to decide whether the time limitation of REM. CODE § 482 (predecessor to RCW 4.84.090) began running upon the signing of the judgment by the judge or upon the filing of the judgment with the clerk. The court held that the filing of the judgment was the critical event. Contrary to Sells' assertion, *Thompson* does not stand for the proposition that the term "judgment" refers to the time when *final* judgment, within the meaning of CR 54(b), has been entered in a case. There appears to be no authority for such a proposition.

■ When a party, such as Sells, is dismissed on summary judgment while other parties remain in the case, and when the party's dismissal is not made "final" under CR 54, that party can file and serve a cost bill at any time during the time intervening between dismissal of the claim against him or her and the entry of final judgment, or wait and do so during the 10 days following entry of final judgment. In the latter event, however, it is not the responsibility of the court or the remaining parties to notify the dismissed party of entry of final judgment; he or she must conduct his or her own monitoring. We do not necessarily encourage multiple hearings on cost bills for dismissed parties before final judgment; there may be issues regarding the sharing of costs with parties who remain in the action, or the trial court may simply prefer to handle cost bills at the end of the case for reasons of judicial economy. But a party who desires to protect him or herself will either promptly file and serve a cost bill following dismissal or will monitor the case and do so within 10 days following entry of final judgment. Sells argues that the court's failure deprived it of a right. It was not the court's failure, it was Sells' own failure to either monitor the case or take the precaution of filing and serving the cost bill promptly after its own dismissal from the case.

■ Sells next argues that its lack of notice of entry of the final judgment also precluded it from seeking an award of reasonable expenses under RCW 4.84.185. This argument is also without merit. RCW 4.84.185 provides that a

prevailing party may bring a motion for reasonable expenses for opposing a frivolous action "after a voluntary or involuntary order of dismissal, order on summary judgment, final judgment after trial, or other final order terminating the action as *to the prevailing party. . . . In no event may such motion be filed more than thirty days after entry of the order*." RCW 4.84.185 (emphasis added). Because Sells was required to bring its motion for reasonable expenses within 30 days following the court's entry of the order dismissing Doolittle's claims against it on September 8, 1995, its lack of notice of entry of the final order on summary judgment dismissing the remaining claims against STOWW, entered some 6 months later, was immaterial.

Reversed in part, affirmed in part.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports but will be filed for public record in accord with RCW 2.06.040, it is so ordered.

WEBSTER and ELLINGTON, JJ., concur.