Baker, J.
International Ultimate, Inc. (IUI) brought this suit after its insurers denied coverage for a fishing vessel and its cargo. IUI appeals the trial court’s decision granting the defendants’ summary judgment, arguing that its loss arose because of barratry — a covered peril. In the alternative, IUI claims that had its insurance broker ob *733 tained a war risk policy as directed, the amended policy would have covered IUI’s loss. IUI also argues that the trial court improperly considered inadmissible documents when granting summary judgment. Finally, IUI claims that the insurer and one of its employees are liable under the Consumer Protection Act[1] (CPA) for negligently investigating and denying its claim.
We hold that any alleged error admitting documents is harmless, and that although the master’s actions may have been barratrous, barratry was not the efficient proximate cause of IUI’s eventual loss. Because IUI has failed to show that a war risk policy would have covered its loss, we dismiss its claim against the insurance broker. IUI fails to present any evidence that its insurers acted negligently or in bad faith when denying its claim. Accordingly, we reject IUI’s CPA claim against the insurers. Finally, we conclude that the CPA is not a vehicle for insureds to sue adjusters in their individual capacity.
I
IUI purchased three fishing vessels in early 1995 and wrote its insurance broker, Sea-Pac, requesting coverage. Sea-Pac obtained hull and machinery insurance and cargo insurance for IUI through several underwriters (St. Paul). The hull policy covered vessel losses arising from certain named perils. The policy did not insure against all risks and contained a “war strikes and related exclusions” section excluding losses due to “[c]apture, seizure, arrest, restraint or detainment [of a vessel], or any attempt threat.” The policy specifically covered losses arising from barratry. Both the hull and cargo policies were in effect at the time of the alleged loss.
IUI wished to fish in Russian economic territorial waters. To facilitate this, IUI entered into several interrelated *734 agreements with a Russian corporation, Moskam.[2] The first contract, titled “Bareboat Charter,” transferred possession and control of the three vessels to Moskam. The agreement required Moskam to pay for maintenance and supplies for the three ships, including fuel and oil. The agreement also required that Moskam procure, manage, and pay for the crew. At the end of the charter period, Moskam would then own the three boats. The agreement required that Moskam and IUI resolve any disputes by submitting the claim to the Sea Arbitration Commission of the Russian Federation, whose decision would be final and binding on both parties.
The second contract, titled “Vessel Management Agreement,” appointed IUI as the exclusive manager for operating the ships under the bareboat charter agreement. Under the agreement, IUI operated the ships and coordinated “delivery, distribution, and sale of all seafood and seafood products harvested by the Vessels.” The agreement also required IUI to pay all operating expenses, including wages, out of proceeds from selling the seafood products.
From the start, IUI and Moskam had a difficult business relationship. By early summer 1997, Moskam and IUI disagreed about disbursements due under the agreements. IUI contended that Moskam had breached the agreements and owed it over $12 million. Moskam claimed that IUI owed it money for past crab and flatfish catches, and that IUI was not making timely payments on invoices from fish sales. In June 1997, IUI withheld vessel regulatory documents because it had not received bareboat charter payments from Moskam.
In mid-July, the salmon season ended and the three boats began their journey back to South Korea, fully loaded with product. Moskam instructed all three vessels to go to a neutral control point to await IUI’s payment of the back invoices. IUI then sent a communication to the vessels demanding that they return to South Korea. Moskam sent a contradictory notice that they should proceed to the *735 Russian port of Petropavlovsk. The Ultimate I and II returned to Pusan, and the Ultimate III went to Petropavlovsk.
The Ultimate III remained at Petropavlovsk from July 1997. IUI and the insurers disagree about whether the ship was arrested by Moskam or detained by the Russian government.
At the end of July, IUI apparently notified Sea-Pac, its insurance broker, that one of its boats “had been taken.” IUI did not formally present a claim until mid-March 1998— nearly nine months after Moskam diverted the Ultimate III to Petropavlovsk. At that time, IUI explained to Sea-Pac that “we . . . request that you notify the hull insurers of the ULTIMATE NO. 3 and its cargo insurers of possible claims arising from barratry of its master and crew.” The letter does not mention any arrest by Moskam or seizure by Russian authorities, stating only that “Moskam has refused to redeliver the vessel to us,” and that “we have lost possession and control of the vessel.”
Following an investigation, St. Paul concluded that the hull policy did not cover IUI’s loss. St. Paul took the position that the loss had been due to a business dispute, not barratry. IUI then brought suit against the underwriters, Donna Zeller (an employee of St. Paul) in her personal capacity, and Sea-Pac Insurance Managers, Inc. The complaint alleged breach of contract, insurer bad faith, CPA violations, fault or negligence, and requested a declaratory judgment establishing coverage under the hull and cargo policies.
During discovery, IUI provided a number of documents, including the vessel management agreement, contracts for purchasing seafood product, ledger sheets, copies of the Russian arbitration decision and affiliated documents, letters exchanged between IUI and Moskam, and the assignment of the Ultimate III to Moskam. The defendants submitted these documents in support of their motions for summary judgment. Before the hearing, IUI moved to strike all of these documents, arguing that the defendants *736 had not properly authenticated the documents and that the defendants did not have personal knowledge of the matters contained in them.
After extensive briefing and argument, the trial court admitted all of the challenged documents. The court then granted the summary judgment motions.
II
When reviewing an order granting summary judgment, we engage in the same inquiry as the trial court.[3] We will affirm an order granting summary judgment only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[4] In reviewing summary judgment orders, we consider supporting affidavits and other admissible evidence that is based on the affiant’s personal knowledge.[5] A party may not rely on mere allegations, denials, opinions, or conclusory statements, but, rather must set forth specifics indicating material facts for trial.[6]

Evidentiary Challenges to Summary Judgment

A trial court’s decision to admit or exclude evidence lies within its sound discretion. We will not overturn evidentiary rulings unless the trial court has manifestly abused its discretion.[7] Although a “ruling on a motion to strike is discretionary with the trial court,” a “court may not consider inadmissible evidence when ruling on a motion for summary judgment.”[8]
*737 IUI challenges a number of documentary exhibits submitted by the defendants with their summary judgment motions. IUI contends that the trial court erred by failing to strike portions of the three insurers’ affidavits together with attachments, because the defendants did not have the personal knowledge required by ER 602. ER 602 provides that:
A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness’ own testimony. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.[9]
ER 602 is not the appropriate vehicle to challenge these documents. ER 602 requires witnesses testifying to have personal knowledge unless they are experts. But the challenged affidavits list only the documents submitted in support of the insurers’ motions for summary judgment and state that the documents are true and accurate copies of the originals. The proper objection is either lack of authentication under ER 901, or hearsay under ER 801-804.
IUI also objects to several of the documents because the defendants failed to properly authenticate them. IUI cites to the requirement of CR 56(e) that supporting affidavits be made on personal knowledge and set forth such facts as would be admissible in evidence. But CR 56(e) allows an attorney to base his or her affidavit on documents properly before the court. And this includes documents already in the court files, as well as additional documents presented by the parties in a motion for summary judgment.[10]
Underlying CR 56(e) is the requirement that documents the parties submit must be authenticated to be admissible. Because the proponent seeking to admit a *738 document must make only a prima facie showing of authenticity, the rule’s requirement of authentication or identification is met if the proponent shows proof sufficient for a reasonable fact finder to find in favor of authenticity.[11] The rule does not limit the type of evidence allowed to authenticate a document; it merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.[12] ER 901 and 902 provide alternative means of authenticating documents in addition to those found in chapter 5.44 RCW and CR 44.[13]
If the challenged documents were properly authenticated under ER 901 or 902, then for summary judgment purposes it is irrelevant whether the insurers’ attorneys had personal knowledge of the proffered documents.[14] IUI conflates the requirements under CR 56(e) that supporting affidavits must be made on personal knowledge and the requirement of ER 901 that documents be authentic. IUI seeks to exclude documents merely because the attorney did not have personal knowledge of the documents. If the documents are properly authenticated and are not excluded because of hearsay, then an attorney may rely on them in a summary judgment motion regardless of any lack of personal knowledge.
Authentication is a threshold requirement designed to assure that evidence is what it purports to be.[15] ER 901 sets forth a number of ways that evidence may comply with the rule.[16] For example, the rule allows documents to be *739 admitted based on the testimony of witnesses with knowledge or based on distinctive characteristics surrounding the document guaranteeing authenticity.[17] Several federal courts have concluded that authentication is also satisfied when the party challenging the document originally provided it in discovery.
In Maljack Productions, Inc. v. GoodTimes Home Video Corp.,[18] documents were offered under an attorney’s affidavit that the documents were produced by the other side in discovery. The Ninth Circuit ruled that because authenticity had not been challenged, the documents were admissible in the summary judgment motion.[19]
In Castaic Lake Water Agency v. Whittaker Corp.[20] the defendants objected that certain evidence attached to the plaintiffs’ declaration was inadmissible because it had not been properly authenticated. The court ruled that although the plaintiffs’ attorney could not authenticate the challenged report, the documents were admissible because the defendant “produced the document itself in response to Plaintiffs’ discovery requests.”[21] The court further noted that although the challenged documents were prepared for another plaintiff in the proceeding, this fact did not affect the document’s admissibility.
In Carson Harbor Village, Ltd. v. Unocal Corp.,[22] the defendants objected to a document submitted for summary judgment on the basis that the plaintiff’s attorney could not properly authenticate it and lacked personal knowledge of the matters set forth in it. The court rejected this argument, explaining that “ ‘discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately *740 authenticated by affidavit or declaration.’ ”[23] The court ruled that the plaintiff’s declaration — that the exhibit was a true and correct copy of the document produced by the defendant during discovery — properly authenticated it for purposes of a summary judgment motion.[24]
We adopt the federal interpretation of ER 901[25] and hold that authentication may be satisfied when the party challenging the document originally provided it through discovery. We now address IUI’s specific objections.

IUI’s evidentiary objections

IUI challenges a number of admitted documents, arguing that they are hearsay. To be admissible as business records, the exhibits must meet the business records test set forth in RCW 5.45.020.[26] We find no abuse of discretion by the trial court in admitting the challenged documents under the business records exception.

St. Paul’s documents

All of the letters and documents exchanged between IUI and Moskam, including the Russian arbitration and eventual award to Moskam, were properly admitted by the trial court because they were produced by IUI in discovery. When the documents were produced, IUI did not claim that they were not authentic or that the documents were not what they purported to be. Because of this, the trial court *741 correctly concluded that the documents were sufficiently authenticated for summary judgment purposes.
IUI argues that St. Paul and Protector Insurance Company submitted a tentative draft of the vessel management agreement and on that basis challenges the document’s admissibility. IUI submitted a separate agreement to the court that it argues is the final agreement. Because these two competing documents are identical in the relevant material aspects, we need not resolve this challenge.
IUI challenges several insurance documents, some of which IUI attached to its complaint. CR 56(e) allows the use of such documents in a summary judgment motion. Because they were in the court file, these documents were properly before the court. Moreover, by providing the documents to the court, IUI sufficiently attested to their authenticity.
The Compagnie d’Assurance Maritimes Aeriennes et Terrestres (CAMAT) policy referenced in St. Paul’s attorney’s declaration was not provided to the court, and therefore should be stricken. But this document does not provide any information relevant to the summary judgment motion, and therefore any error in failing to strike the document was harmless.[27]
The internal correspondence and reports provided by St. Paul present a different question. Many are not properly authenticated by someone with knowledge of the documents. But several documents, including an investigative report by Joseph Berger and an expert analysis by a Dutch attorney, were allegedly commissioned by St. Paul’s attorney, John Hayes. In his second declaration, that attorney states:
I personally engaged Joseph Berger as an expert and assigned him the task of using Russian operatives to determine the sequence of events after July 17, 1997 when the master of the ULTIMATE III returned the vessel to Russian waters. Exhibits 58, 59, 60 and 61 are authentic records and reports and arise from my engagement of Joseph G. Berger as an expert.
*742 The report is addressed to Hayes. Hayes’ declaration is sufficient to authenticate the report. But because the letter from the Dutch attorney is addressed to St. Paul’s investigator Donna Zeller, the declaration is not sufficient to authenticate the document.
Another document, a letter from attorney Hayes to an investigator, is also properly authenticated because Hayes had personal knowledge of its authenticity.
Hayes does not claim the same degree of familiarity with the other documents. Although he explains that he reviewed the documents and made copies from the originals, he does not establish personal knowledge. Absent such knowledge, he cannot satisfy the prima facie showing of authenticity required for admissibility. Therefore, the trial court abused its discretion by admitting the e-mail from Berger to Zeller, a faxed letter from the Dutch attorney to Zeller, a letter from Zeller to IUI’s attorney, and a letter from an independent attorney Terry McCall to Zeller.

Sea-Pac’s documents

IUI objects to three additional Sea-Pac documents. These documents — attorney Mills’ declaration, a page from Sea-Pac’s summary judgment motion attached as an exhibit, and an excerpt from Kelly Barber’s deposition — are all contained in Sea-Pac’s summary judgment motion.
Mills’ declaration lists the documents that Sea-Pac relies on in its summary judgment motion and does not contain any factual assertions. Any documents stricken by this court because they lack authenticity do not affect the rest of the declaration.
The page that IUI included in its motion consists of facts and a statement of position by Sea-Pac. Allowing the document was not error. Finally, the court’s decision to admit Barber’s deposition was not error.

Protector Insurance’s documents

IUI next objects to seven additional documents submitted by Protector. IUI argues that the court could not consider these documents because Protector’s attorney lacked the *743 testimonial knowledge required to authenticate the exhibits under CR 56(e). IUI asserts that the only attempt to authenticate the documents is a declaration from Protector indicating that they are true and accurate copies. IUI fails to note that Protector obtained all of these documents from IUI during discovery and clearly indicated this on its affidavit.
A commentary to the Norwegian Cargo Clause was not provided by IUI in discovery. But excluding this document does not affect Protector’s summary judgment because it was not relied on by the trial court in its ruling that a war policy would not have covered IUI’s loss.

Coverage under the Policy

Interpreting an insurance policy is a matter of law that we review de novo.[28] Whether coverage exists is a two-step process.[29] First, the insured must prove that the policy covers his loss. Thereafter, to avoid coverage, the insurer must prove that specific policy language excludes the insured’s loss.[30] Ultimately, however, “[t]he court determines coverage by characterizing the perils contributing to the loss, and determining which perils the policy covers and which it excludes.”[31]

Coverage under St. Paul’s Policy

“Barratry of the Master and Mariners” is a covered peril under the standard hull policy issued to IUI. While the hull policy itself does not define barratry, it is an ancient concept well defined by American courts. Recent decisions state that there are three elements necessary to establish barratry:
1) The barratrous acts were committed by a master or mariner of the subject vessel;
*744 2) The master or mariner acted with some unlawful or fraudulent purpose, with gross negligence, or contrary to the owner’s instructions; and
3) That as a direct result, the owner suffered a loss.[32]
Under the English Marine Insurance Act’s definition, barratry also includes “every wrongful act wilfully committed by the master or crew to the prejudice of the owner, or, as the case may be, the charterer.”[33] This definition of barratry, including acts against the charter, has been accepted by the United States Supreme Court.[34]
Moskam and IUI agreed to a demise charter transferring effective ownership to Moskam. But they also executed a contemporaneous management agreement that apparently reinvested control and decision-making authority with IUI. From the pleadings and depositions submitted, it is possible that Moskam did not have the authority to redirect the ship to Russia. If that is the case, then the master did engage in barratry when he changed course from Pusan to Russia. For the purposes of summary judgment, because there are questions of fact surrounding the management contract’s application, we presume that the master engaged in barra-try.
 In admiralty cases, the “ ‘cause which is truly proximate is that which is proximate in efficiency.’ ”[35] In United States Fire Insurance Co. v. Cavanaugh,[36] the captain committed a barratrous act when he took the vessel outside the navigational limits of the policy. The vessel then ran aground and burned. The insurance contract specifically insured against damages flowing from barratry, grounding, and/or burning. Because the insurance contract *745 specifically provided coverage for the risks which caused the damage, recovery was permitted. The appellate court followed reasoning similar to that used by the court in Republic of China v. National Union Fire Insurance Co.:[37]
[W]here barratry is one of the causes of the loss, if the ultimate cause (such as stranding or capture) is not excluded from coverage by a warranty or an exclusion clause, recovery may be had on the grounds of barratry, whether or not the ultimate cause of loss was or was not a peril insured against [b]ut where the ultimate cause of the loss is excluded from coverage by a warranty or an exclusion clause, recovery may not be had on the grounds of barratry.[38]
But when the loss occurs because of a supervening event, the master’s barratry is not the efficient proximate cause of the loss. For example, in Nautilus Virgin Charters, Inc. v. Edinburgh Insurance Co.,[39] a vessel was seized in Colombian territorial waters for carrying marijuana. The court held that although the master’s unauthorized deviation to Colombia constituted barratry, the proximaté cause of the loss was the government’s seizure, an excluded peril under the policy.[40] And in Ope Shipping, Ltd. v. Allstate Insurance Co.,[41] the court held that the “real efficient cause” of the loss of Nicaraguan vessels was not barratry by their crews in sailing to ports friendly to the Sandinista revolutionaries, but rather the Nicaraguan civil war, an excluded peril under the policy’s war strikes and related exclusions clause.[42]
This rule is consistent with Kimta AS v. Royal Insurance Co.,[43] in which this court held that a master’s negligence leading to a seizure was excluded from coverage because *746 the standard free of capture and seizure clause specifically excluded cargo losses due to seizure.[44] Under Kimta, unless the ship’s cargo was damaged by the master’s barratry, the loss is excluded.[45]
Under the policy at issue in this case, any loss of the vessel due to arrest or detainment is not covered. The hull policy contains a standard “war strikes and related exclusions” clause that excludes all losses due to “[cjapture, seizure, arrest, restraint or detainment. . . [or] [a]ny taking of the Vessel, by requisition or otherwise . . . whether lawful or otherwise.” An arrest is “a temporary detention with the intent to liberate or restore the property later, or pay the value thereof.”[46]
Moskam sent a request to the International Court of Commercial Arbitration (ICCA) in May 1998 requesting that it seize the Ultimate III. The ICCA seized the ship in June 1998. Had IUI wished to obtain a release of its ship, it would have had to secure a bank letter of credit for the $2.9 million claim Moskam had pending before the ICCA.
IUI argues that once the master took the ship to Russia, it lost control of the vessel. But IUI acknowledged in oral argument that it could have paid to have the ship released, and that it chose not to do so because the cost to release the ship was greater than the ship’s value. IUI argues that the barratry caused a constructive loss of the ship, and that it was entitled to coverage.
St. Paul presented evidence that upon arriving in Russia, the ship was first detained by the Russian government and later arrested by Moskam for the disputed payments. Once the ICCA seized the ship, any loss to IUI occurred because of the business dispute. We conclude that the loss occurred because of the later award of the ship to Moskam to satisfy *747 the arbitration award. And both the detention and arrest are excluded from coverage under the policy.
Without the arbitration award and subsequent transfer to Moskam, the barratry would clearly have been the loss. But here, the loss occurred not when the ship was detained by the master, as IUI argues, but when the ship’s title transferred to Moskam. Accordingly, we conclude that the efficient proximate cause of IUI’s loss was the arrest and detainment.

Claims against Sea-Pac

IUI argues that Sea-Pac should have procured a war risk endorsement for the Ultimate III, and that this would have covered the loss of the Ultimate III. But IUI fails to cite any documents or facts to show that Sea-Pac negligently failed to obtain the war risk endorsement.
IUI also fails to show how the war strikes endorsement would have covered its loss. IUI has not provided the court with language from the endorsement and cites only to language in the policy’s war strikes exclusion, inferring that a war strikes endorsement would have covered all the exclusions listed in the war strikes exclusion. That inference is unsupported by any relevant authority and is shown not to be true, based upon authority cited by Sea-Pac.[47]
Essentially, IUI argues that because the efficient proximate cause of the loss was the master’s barratry of the vessel, the loss was covered. Because we conclude that the loss was due to a business dispute, and that the loss occurred either when Moskam arrested the ship or effected a transfer of title, Sea-Pac is not liable for allegedly failing to procure a war risk endorsement.

CPA Claims

IUI argues that St. Paul acted unreasonably and violated the CPA. IUI claims that St. Paul failed to pursue its barratry claim, did not decisively grant or deny its claim, and misrepresented pertinent facts and policy provisions.
*748 An insured “may maintain an action against its insurer for bad faith investigation of the insured’s claim and violation of the CPA regardless of whether the insurer was ultimately correct in determining coverage did not exist.”[48] Under RCW 48.01.030, an insurer must act in good faith when dealing with its insureds. The insurer’s fiduciary duty to act in good faith is fairly broad and may be breached by conduct short of intentional bad faith or fraud.[49] A breach of the insurer’s duty may also lead to a CPA claim by the insured.
A valid CPA claim requires (1) an unfair or deceptive act or practice in trade or commerce that impacts the public interest and (2) a resulting injury to the claimant’s business or property.[50] The insured may establish the first element by showing a violation of any subsection of WAC 284-30-330.[51]
When a CPA claim is based upon an insurer’s denial of coverage, an insured must show more than an incorrect denial of coverage. The insured must also establish that the insurer acted “without reasonable justification” in denying coverage.[52] The test is not whether the insurer’s interpretation is correct, but whether the insurer’s conduct was reasonable.[53]
*749 For its summary judgment motion, St. Paul presented a number of challenged documents showing its diligence in investigating IUI’s claim. St. Paul failed to properly authenticate many of these documents. But even without the excluded documents, summary judgment was proper because IUI fails to cite to any relevant evidence supporting its conclusory assertions of bad faith. Although IUI claims that “St. Paul misrepresented pertinent facts and insurance policy provisions,” the only citation supporting its claims is a reference to Berger’s investigative report where Berger refers to “this apparent barratry.” But unsupported allegations without more cannot survive summary judgment. Simply put, because St. Paul has provided evidence showing that it did not act in bad faith, IUI must put before the court some facts showing bad faith or negligence. Because IUI failed to make a prima facie showing of bad faith investigation of its claim, summary judgment was appropriate. And because we conclude that St. Paul’s decision denying coverage was reasonable, we also dismiss IUI’s CPA claims for bad faith denial of coverage.
IUI also claims that St. Paul’s adjuster Donna Zeller acted in bad faith by denying its claim for coverage. IUI sued Zeller in her personal capacity, alleging that she committed the torts of negligence and insurance bad faith, seeking to hold Zeller personally liable under the CPA and common law negligence. IUI does not provide any specific instances showing that Zeller acted in bad faith. Rather, it seems to argue that Zeller is liable based on the liability of St. Paul.
IUI argues that it can bring a claim against Zeller in her personal capacity for violating the CPA, citing Gould v. Mutual Life Insurance Co. of New York [54] In Gould, the court explained that “[t]he law is clear that corporate officers and agents can incur personal liability under the Consumer Protection Act and that an insurance company which breaches its duty to act in good faith is subject to *750 liability under the act.”[55] But in Gould, the court also held that the attorney agents had become de facto corporate officers and were personally liable in that corporate officer capacity.[56] Further, Gould has been overruled by Haber-man v. Washington Public Power Supply System,[57]
 To be liable under the CPA, there must be a contractual relationship between the parties. Here, the contractual relationship was between IUI and its insurance providers. We dismiss IUTs claim against Zeller because the CPA does not contemplate suits against employees of insurers.
We also dismiss IUI’s common law negligence claim. IUI cites to Dodson v. Economy Equipment Co.[58] for the proposition that as an agent, one can be held personally liable.[59] But Dodson and its progeny have all limited its application to circumstances where the tortfeasor was a corporate officer who actively participated in a conversion.[60]
Finally, we reject IUI’s request for attorney fees because the request is predicated on coverage.
Affirmed.
Agid and Appelwick, JJ., concur.
Reconsideration denied June 24, 2004.
Review denied at 153 Wn.2d 1016 (2004).

 Ch. 19.86 RCW.

 As a Russian corporation, Moskam alone could operate in the Russian Economic Zone.

 Doolittle v. Small Tribes ofW. Wash., Inc., 94 Wn. App. 126, 134, 971 P.2d 545 (1999).

 CR 56(c); Doolittle, 94 Wn. App. at 134.

 CR 56(e); Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988).

 CR 56(e); Grimwood, 110 Wn.2d at 359.

 State v. Bourgeois, 133 Wn.2d 389, 399, 945 P.2d 1120 (1997).

 King County Fire Prot. Dist. No. 16 v. Hous. Auth. of King County, 123 Wn.2d 819, 826, 872 P.2d 516 (1994).

 ER 602.

 CR 56(e); see also Mithoug v. Apollo Radio of Spokane, 128 Wn.2d 460, 463, 909 P.2d 291 (1996) (“CR 56(c) refers to judgments rendered on the ‘pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any ....’”) (quoting CR 56(c) (emphasis added)).

 State v. Payne, 117 Wn. App. 99, 106, 69 P.3d 889 (2003), review denied, 150 Wn.2d 1028 (2004).

 Payne, 117 Wn. App. at 106.

 State v. Ross, 30 Wn. App. 324, 327, 634 P.2d 887 (1981).

 Burmeister v. State Farm Ins. Co., 92 Wn. App. 359, 368, 366-67, 966 P.2d 921 (1998) (recognizing that document cannot be authenticated by merely presenting certification from attorney with no personal knowledge about authenticity or contents of document).

 Payne, 117 Wn. App. at 106.

 ER 901(b)(l)-(10).

 ER 901(b)(1), (b)(4).

 81 F.3d 881 (9th Cir. 1996).

 Maljack, 81 F.3d at 889 n.12.

 272 F Supp. 2d 1053 (C.D. Cal. 2003).

 Castaic, 272 F. Supp. 2d at 1062 n.8.

 287 F. Supp. 2d 1118 (C.D. Cal. 2003).

 Carson, 287 F. Supp. 2d at 1134 n.64 (quoting Chevron, U.S.A. Prod. Co. v. O’Leary, 958 F. Supp. 1485, 1492 (E.D. Cal. 1997)).

 Carson, 287 F. Supp. 2d at 1134 n.64.

 Tegland notes that “[a] few courts have held that a document is deemed authenticated as coming from the opposing party simply by the fact that it was produced by the opposing party during discovery.” 5C Karl B. Tegland, Washington Practice: Evidence § 901.9 (4th ed. Supp. 1999).

 RCW 5.45.020 provides:
A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

 The document merely recites that there is a policy with CAMAT for $2,300,000. There is no listing of terms, conditions, or exclusions.

 McDonald, v. State Farm Fire & Cas. Co., 119 Wn.2d 724, 730-31, 837 P.2d 1000 (1992).

 McDonald, 119 Wn.2d at 731.

 Overton v. Consol. Ins. Co., 145 Wn.2d 417, 431-32, 38 P.3d 322 (2002).

 Bowers v. Farmers Ins. Exch., 99 Wn. App. 41, 44, 991 P.2d 734 (2000).

 Minelli v. Frank B. Hall & Co. of Mo., 898 F. Supp. 615, 619 (N.D. 111. 1995).

 M.D. Chalmers & J.G. Archibald, The Marine Insurance Act, 1906, Rules for Construction of Policy, Rule 11, at 176 (3d ed. 1922).

 Patapsco Ins. Co. v. Coulter, 28 U.S. 222, 7 L. Ed. 659 (1830).

 U.S. Fire Ins. Co. v. Cavanaugh, 732 F.2d 832, 835 (11th Cir. 1984) (quoting Lanosa Fruit S.S. & Importing Co. v. Universal Ins. Co., 302 U.S. 556, 563, 58 S. Ct. 371, 82 L. Ed. 422 (1938)).

 732 F.2d 832 (11th Cir. 1984).

 151 F. Supp. 211 (D. Md. 1957), aff’d, 254 F.2d 177 (4th Cir. 1958).

 Republic of China, 151 F. Supp. at 231 (emphasis added) (citation omitted).

 510 F. Supp. 1092 (D. Md. 1981).

 Nautilus, 510 F. Supp. at 1100.

 687 F.2d 639 (2d Cir. 1982).

 Ope, 687 F.2d at 641-42.

 102 Wn. App. 716, 9 P.3d 239 (2000).

 Kimta, 102 Wn. App. at 727.

 Kimta, 102 Wn. App. at 726-27.

 1 Alex L. Parks, The Law and Practice of Marine Insurance and Average 308 (1987).

 See, e.g., Kimta, 102 Wn. App. at 727-28 (holding that war risk coverage does not reinstate what war strikes and related exclusions excludes).

 Coventry Assocs. v. Am. States Ins. Co., 136 Wn.2d 269, 279, 961 P.2d 933 (1998).

 Indus. Indem. Co. of the N.W., Inc. v. Kallevig, 114 Wn.2d 907, 916-17, 792 P.2d 520 (1990).

 Kallevig, 114 Wn.2d at 920-21; Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986).

 See Kallevig, 114 Wn.2d at 923.

 Kallevig, 114 Wn.2d at 917.

 Roberts v. Allied Group Ins. Co., 79 Wn. App. 323, 326, 901 P.2d 317 (1995) (“ A denial of coverage based on a reasonable interpretation of the policy is not bad faith, and even if incorrect, does not violate the Consumer Protection Act if the insurer’s conduct was reasonable.’ ”) (quoting Transcon. Ins. Co. v. Wash. Pub. Utils. Dists.’ Util. Sys., Ill Wn.2d 452, 470, 760 P.2d 337 (1988)); see also Villella v. Pub. Employees Mut. Ins. Co., 106 Wn.2d 806, 821, 725 P.2d 957 (1986) (recognizing that incorrectly denying coverage “based on reasonable conduct of the insurer does not constitute an unfair trade practice”).

 37 Wn. App. 756, 683 P.2d 207 (1984).

 Gould, 37 Wn. App. at 759 (citations omitted).

 Gould, 37 Wn. App at 760.

 109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987) (overruling recognized by Manteufel v. Safeco Ins. Co. of Am., 117 Wn. App. 168, 174, 68 P.3d 1093, review denied, 150 Wn.2d 1021 (2003)).

 188 Wash. 340, 62 P.2d 708 (1936).

 Dodson, 188 Wash, at 343-44.

 See, e.g., Johnson v. Harrigan-Peach Land Dev. Co., 79 Wn.2d 745, 752, 489 P.2d 923 (1971); Franklin v. Gilbert Ice Cream Co., 191 Wash. 269, 275, 71 P.2d 52 (1937); Betchard-Clayton, Inc. v. King, 41 Wn. App. 887,893, 707 P.2d 1361 (1985); Inland-Ryerson Constr. Prod. Co. v. Brazier Constr. Co., 7 Wn. App. 558, 567-68, 500 P.2d 1015 (1972). But see Consulting Overseas Mgmt., Ltd. v. Shtikel, 105 Wn, App. 80, 84, 18 P.3d 1144 (2001) (distinguishing Dodson, 188 Wash. 340).