270 P.3d 599 (2011)
161 Wash.App. 1
Tara A. GARCIA, individually and as personal representative of the Estate of Frank J. Garcia, Appellant,
v.
The STATE of Washington DEPARTMENT OF TRANSPORTATION, the State of Washington, and the City of Shoreline, Respondents.
No. 63689-8-1.
Court of Appeals of Washington, Division 1.
February 22, 2011.
Publication Ordered May 2, 2011.
*600 John R. Walicki, Law Office of John R. Walicki, Seattle, WA, for Appellant.
Andrew G. Cooley, Catherine Hendricks, WA. Att. General, Michael W. Brown, Lee Smart PS Inc., Seattle, WA, for Respondents.
Pamela B. Loginsky, WA. Assoc. of Pros. Att., Olympia, WA, for Amicus Curiae.
SCHINDLER, J.
¶ 1 Frank Garcia was killed when the car driven by Diana Cushing struck him while he was crossing the street at the intersection of North 170th Street and Aurora Avenue North. Cushing admitted that she "wasn't really looking" and was talking to her son who was sitting in the passenger seat, and she did not see Garcia until "about two second[s] before" hitting him in the crosswalk with her car. Tara Garcia, individually and as the personal representative of the Estate of Frank Garcia (Estate), appeals summary judgment dismissal of negligence claims against the Washington State Department of Transportation (WSDOT) and the City of Shoreline (City). Because as a matter of law neither the failure of WSDOT to properly install and activate a "roving eyes" device over the crosswalk, nor the City's decision to not install traditional traffic signals was a proximate cause of Garcia's death, we affirm.

FACTS
¶ 2 Diana Cushing struck and killed Frank Garcia while he was in the crosswalk at the intersection of North 170th Street and Aurora Avenue North. Before the accident on October 26, 2002, WSDOT and the City made a number of improvements to enhance pedestrian safety at that intersection.
¶ 3 Aurora Avenue North is a state highway and a major arterial through the city of Shoreline. At the intersection of North 170th Street and Aurora Avenue North, the southbound and northbound lanes are separated by a median. The posted speed limit is 40 miles per hour (m.p.h.).
¶ 4 In the mid-1990s, the City hired traffic engineer consultant William Haro to conduct a pedestrian safety study. In Haro's 1998 report, he recommended a number of safety improvements. Based on the report, the City obtained federal "Hazard Elimination Safety" grants to improve pedestrian safety. At around the same time, WSDOT was working with the Washington State Traffic Safety Commission to develop a plan to improve *601 pedestrian safety along Aurora Avenue North. One recommendation was to select a limited number of projects to implement the identified recommendations. WSDOT obtained federal safety funds to do so.
¶ 5 In the spring of 1999, the City and WSDOT agreed to combine the federal grants for pedestrian safety improvements on Aurora Avenue North. The intersection at North 170th Street and Aurora Avenue North was one of the two intersections selected by the City and WSDOT. WSDOT assumed responsibility for construction and installation of the pedestrian safety improvements.
¶ 6 The project at the intersection of North 170th Street and Aurora Avenue North consisted of nine pedestrian safety improvements. The nine improvements are:
(1) Marked cross walk [sic] at North 170th Street;
(2) Raised planted medians with a pedestrian refuge path cut through the median at an angle so pedestrians can view oncoming traffic;
(3) Advance yield bars 40 feet in advance of the designated pedestrian crosswalk;
(4) 2′ × 3-1/2′ Advance Yield for Pedestrian warning signs on both sides of the yield bar to the approaching drivers['] right and left;
(5) Enhanced overhead lighting of the intersection and crosswalk;
(6) Relocated transit stops;
(7) New sidewalks, curbs and gutters;
(8) Overhead electronic LED [light emitting diode] animated roving-eyes warning signs for motorists and pedestrian-height signs for pedestrians; and
(9) 4′ × 4′ Pedestrian warning signs 300 feet in advance of each crosswalk, both directions, with an amber beacon.
By June 2002, the nine pedestrian safety improvements were installed at the intersection of North 170th Street and Aurora Avenue North.
¶ 7 Based on a study showing that use of the roving eyes device increased the number of motorists who yielded to pedestrians, WSDOT and the City decided to include the experimental technology as part of the project. Because the experimental roving eyes device did not comply with the "Manual on Uniform Traffic Control Devices" (MUTCD) of the Federal Highway Administration (FHWA), WSDOT sought approval to use the device. The FHWA approved installation of the roving eyes device
¶ 8 The roving eyes device is an overhead LED display that is designed to flash when a pedestrian enters the crosswalk. The display uses a passive detection system designed to "sense" the presence of a pedestrian and begin flashing.
¶ 9 The roving eyes device was installed in June 2002. But the roving eyes device did not work properly. WSDOT engineers worked with the private vendor to solve the problem and fix the device. On September 25, WSDOT and the vendor determined that the wiring was faulty. New parts were ordered but did not arrive until October 30. Consequently, the roving eyes device was not working at the time of the accident.
¶ 10 On October 26, 2002, Frank Garcia was shopping at the Pawn Exchange. The Pawn Exchange is located at the intersection of North 170th Street and Aurora Avenue North. Just before 5 p.m., Garcia left the Pawn Exchange to cross the street to use the restroom at Parker's Casino. It was still daylight outside and the weather was clear. Garcia used the marked crosswalk to get to Parker's Casino.
¶ 11 Garcia used the crosswalk to return to the Pawn Exchange. A Volkswagen van driven by James Green stopped in the outside southbound lane to let Garcia cross. Garcia nodded at Green as he started to cross in front of Green's van. Green said that while he was waiting for Garcia to cross, two other cars stopped behind his van.
¶ 12 Green said that a car drove past him in the next lane traveling close to the speed limit of 40 m.p.h. and did not slow down. Green watched as the car drove into the crosswalk and hit Garcia. The right front of the car hit Garcia in the left leg. Garcia's head hit the windshield of the car. After the *602 impact, Garcia was thrown approximately 49 feet into the intersection.
¶ 13 Diana Cushing was the driver of the car that hit Garcia. Right after the accident, Cushing gave a statement to Detective James Leach of the Major Accident Response and Reconstruction Unit of the King County Sheriff's Office. Cushing admitted that she was talking to her 13-year-old son Andrew Bergstrom who was sitting in the passenger seat and that she was not paying attention or looking ahead. Cushing said that she did not notice the three cars stopped in the next lane at the crosswalk and she did not see Garcia. Cushing said that after her son yelled at her to stop, she slammed on the brakes but was unable to avoid hitting Garcia in the crosswalk.
Cushing: I was driving southbound on Aurora and I was talking to my son, who was sitting in the passenger side seat and I wasn't really looking and apparently somebody ... from the outside lane had screeched and I didn't really notice it and then this man walked ... walked out into the street on ... from the west hand side of the road and into the....
Leach: So he would have been going from your right to your left?
Cushing: Yes. Yeah.
Leach: Okay.
....
Cushing: And he ... I didn't see him and he just ...
Leach: When was the first time you saw him?
Cushing: I ... about two second [sic] before I hit him.
....
Leach: Now the vehicle ... you said there was a vehicle on the outside lane?
Cushing: I ... I didn't even notice the vehicle on the outside lane. I didn't ...
Leach: Okay.
Cushing: I didn't really ... I didn't see him....
¶ 14 Cushing's son Andrew told Detective Leach that he saw Garcia walking quickly as he was crossing in front of Green's van and yelled at his mother to stop. Andrew said that when Garcia saw Cushing's car driving towards him, he looked startled and jumped back.
¶15 Detective Leach determined that Cushing was driving approximately 36 m.p.h. at the start of the first skid mark and estimated she was driving at approximately 27 to 30 m.p.h. when her car hit Garcia. Surveillance cameras also showed that Green slowed down as he approached the intersection but that Cushing did not slow down.[1] The traffic collision report prepared by Detective Leach states that the accident was caused by Cushing's improper passing, her failure to yield to a pedestrian, and her inattention. Garcia died the next morning from his injuries. The State charged Cushing with negligent driving in the second degree.
¶ 16 Tara Garcia, individually and as the personal representative of the Estate of Frank Garcia, filed a wrongful death action against Cushing, WSDOT, the manufacturer of the roving eyes device, the manufacturer of the microwave sensors used in the roving eyes device, and the contractors who installed the roving eyes device. Cushing stipulated to entry of a final judgment against her for $883,884.31.
¶ 17 WSDOT filed a summary judgment motion arguing that the intersection was reasonably safe for ordinary travel, the sole proximate cause of Garcia's death was Cushing's inattentiveness, and the decision to install the improvements was a discretionary governmental decision. In support, WSDOT submitted the declarations of accident reconstruction expert Richard Chapman and the WSDOT traffic engineer for the northwest region, Mark Leth, as well as the declarations of highway engineering experts Charles Zegeer of the University of North Carolina Highway Safety Research Center and Michael Cynecki, a traffic engineer for the city of Phoenix.
*603 ¶ 18 Chapman confirmed that at the time of impact, Cushing's speed was at least 36 m.p.h. and that when Garcia was struck, he was in the crosswalk. Chapman also determined that the brake lights of Green's van and the two cars behind him had been on for a minimum of three seconds while Garcia was crossing. In Chapman's opinion, the accident was caused by Cushing's failure to pay attention as she entered the intersection, her inattention to the reflective warning signs for the approaching crosswalk, and her failure to notice the vehicles stopped in the next lane.
¶ 19 The traffic experts testified that the intersection met applicable safety standards and the crosswalk was reasonably safe for ordinary travel. WSDOT traffic engineer Leth testified that WSDOT was not required to install a traffic control signal at the intersection because the intersection did not meet the criteria in the MUTCD, and the improvements made to the intersection were a matter of engineering discretion.[2]
¶ 20 Leth also stated that while the roving eyes device increased the likelihood that motorists would yield to pedestrians, compliance with the roving eyes device was not consistent. According to Leth, after the push button activation system was installed in November 2002, only one third of pedestrians activated the roving eyes device. Leth said that it would be speculative to conclude that Garcia would have used the device had the push button system been installed.
¶ 21 Cynecki and Zegeer also stated that it would be speculative to conclude that Cushing would have reacted differently if the roving eyes device had been properly working. According to Zegeer, the fact that Green's van was stopped at the crosswalk and that the two cars were stopped behind the van was the most important "visual clue" that a pedestrian was crossing.
[T]he most important visual clue to Ms. Cushing that a pedestrian was crossing Aurora as she approached the intersection was the fact that the lead vehicle to her right had come to a stop at this intersection and two following vehicles were slowing to a stop as she approached the intersection clearly marked as a pedestrian crossing.
Cynecki also concluded that Cushing's failure to notice the cars stopped in the next lane was "a clear indication that she was not paying attention."
¶ 22 In opposition, the Estate submitted the declaration of traffic engineer Timothy Miller. Relying on Miller, the Estate argued that because studies showed that the roving eyes device was successful in redirecting the attention of inattentive drivers, it was reasonable to infer that if the device had been working it would have alerted Cushing that a pedestrian was in the crosswalk and increased the likelihood that she would have yielded. Miller stated, in pertinent part:
[I]f the "roving eyes" system had been activated at the time of the collision or if some other traditional over the roadway amber light had been installed and operating, either would have been more effective than the de-activated "roving eyes" system to alert Diana Cushing or her front seat passenger that a pedestrian was crossing at the time, thereby causing her to stop and avoid the collision.
¶ 23 Without reference to engineering guidelines, Miller concluded that WSDOT should have "activated the `roving eyes' system sooner," left the roving eyes system operating during the time they were troubleshooting the system, used push button controls or some "other more reliable detection technology rather than pole mounted microwave sensors," used a more traditional over the roadway amber light display, or installed pedestrian instructional signs similar to those later requested by WSDOT.
¶ 24 The Estate also argued that driver inattention at the intersection was reasonably foreseeable, and that WSDOT and the City created a hazardous condition by turning off the device when it was not functioning properly.
¶ 25 The trial court granted WSDOT's motion for summary judgment. The court ruled *604 that the use of the roving eyes device was a discretionary decision and failure to activate the device was not a proximate legal cause of the accident. The trial court ruled, in pertinent part:
Counsel, I think the way this breaks down is this: The decision to try using that roving eye sign was a discretionary decision that was made by the governmental entities involved, the City of Shoreline, the WSDOT utilizing Federal money.
The truth of the matter is, almost all of the improvements that were to be made at that particular site were made except for the fact that the roving eye sign, up until after this accident occurred, was not working properly.
It seems to me that the Department of Transportation exercised its discretion in how to deal with that problem. The problem being the signage, the cautionary signage, the roving eye, was not working right.
So you have two choices. You either shut it down, because it is not working right or you, in the alternative, leave it running knowing full well it is not working right.
The bottom line is they opted for the more sensible position, and they shut it down.
I don't see any reason why it would have to be bagged, because I don't believe it does fit in under the rubric of a traffic signal. Even if it did, there is no point in arguing that issue because the sign itself was completely black when it was shut down.
Could an argument be made that it could be fixed faster? I suppose so. But I think that still comes within the discretionary call of DOT, and the resources they have available.
It may be true that after the accident occurred they moved with greater alacrity as a result of that, but that doesn't mean they were negligent in not moving as quickly earlier on with the resources they had.
With regard to whether or not the absence of that sign was a cause in fact, I suppose you could say that reasonable minds could differ. If the defendant was looking forward and the sign fulfilled its purpose, which is to alert people to the intersection, and it works better than normal signage, just maybe it might have made a difference. I suppose we could say that's a material issue of fact.
But when you get right down to it, counsel, I don't think there is any legal causation here. I do think the decisions that were made by the State were discretionary.
When you look at legal causation you have to consider logic, common sense, justice, policy and precedent. And when I put all those things into a mix, what I end up with is granting the State's motion for summary judgment for dismissal.
So, counsel, I would appreciate it if you could craft the order up, making sure that all the attachments and so forth are cataloged and indicate that the Court is making the determination strictly on the notion that the determination to shut off the roving eye was discretionary, as far as I was concerned, and that I don't find legal causation.
¶ 26 After dismissal of the claims against WSDOT, the Estate filed an amended complaint naming the City of Shoreline as a defendant. The Estate alleged the City should have requested installation of a traditional traffic control signal at the intersection. The City filed a motion for summary judgment. In opposition, the Estate submitted the declaration of Miller.
¶ 27 Miller conceded that the installation of a traffic control signal is a matter of "`engineering discretion to be exercised when specific criteria or warrants are met.'" Miller also conceded that "satisfaction of one or more warrants does not in itself require the installation of a traffic signal and that the decision still comes down to `engineering discretion' even if the criteria are satisfied."
¶ 28 Nonetheless, Miller stated that in his opinion, the "proper exercise of engineering discretion called for the installation of the more traditional traffic control signals utilizing pedestrian push button controls." According to Miller, if the City had requested a traffic control signal, the request would have *605 been granted, the signal would have been installed before the accident, and the collision would not have occurred.
¶ 29 Miller also concluded that while the crosswalk was "not reasonably safe for pedestrians prior to the improvements being made," because the marked crosswalk did not have an operational traffic control, the improvements potentially gave a "false sense of security to pedestrians in a multiple threat environment."
¶ 30 The trial court granted the City's motion for summary judgment. The court ruled, in pertinent part:
First, is there any proof of negligence by omission by the City that is tied inextricably in the Court's view with the second issue, which is whether there's any evidence that the state Department of Transportation would have approved such a request in a timely manner. The evidence before this court is that, in the opinion of Mr. Miller, who by all accounts is certainly qualified as an expert in this area, in his opinion, the City failed to exercise proper engineering discretion by not demanding or requesting of the state Department of Transportation the installation of traditional traffic control signals at this intersection.
He then goes on to opine that, quote: A traditional traffic control signal would have been operational before the collision because it would not have encountered the same operational problems the experimental roving eyes technology did.
That is not a sufficient factual basis for the conclusion, or there is no sufficient factual basis for the conclusion Mr. Miller reaches. He does nothing to address how it is that the process of approval works within the department, when the department's [sic] or the department would have had to receive the request from the City, and basically how long that process takes and what the factors are that go into the analysis of whether, in fact, such a request would have been approved.
It is clear from the evidence before the Court that the state Department of Transportation had made a decision in its discretion to install this experimental, very expensive traffic control device at this intersection rather than install a traditional traffic control signal. There is, in the Court's view, no evidence and no genuine issue of material fact to establish that the department would have, in fact, approved such a request under [RCW] 47.24.020 Sub 13 in a timely manner had the City made such a request for the installation of a traditional traffic control device at that intersection.

ANALYSIS
¶ 31 The Estate appeals summary judgment dismissal of the claims against WSDOT and the City. The Estate asserts that as a matter of law, the failure of WSDOT to activate the roving eyes device or install other technology was a proximate cause of the accident, and the City's failure to request installation of traditional traffic control signals was a proximate cause of the accident.
¶ 32 We review summary judgment de novo. Hartley v. State of Wash., 103 Wash.2d 768, 774, 698 P.2d 77 (1985). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. CR 56(c).
¶ 33 A defendant can move for summary judgment by showing that there is an absence of evidence to support the plaintiff's case. Young v. Key Pharm., Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989). If the defendant shows an absence of evidence to establish the plaintiff's case, the burden then shifts to the plaintiff to set forth specific facts showing a genuine issue of material fact for trial. Young, 112 Wash.2d at 225, 770 P.2d 182.
¶ 34 While we construe all evidence and reasonable inferences in the light most favorable to the nonmoving party, if the plaintiff "`fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,'" summary judgment is proper. Jones v. Allstate Ins. Co., 146 Wash.2d 291, 300, 45 P.3d 1068 (2002); Young, 112 Wash.2d at 225, 770 P.2d 182 (quoting Celotex Corp. v. Catrett, 477 *606 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).
¶ 35 The nonmoving party may not rely on speculation or "mere allegations, denials, opinions, or conclusory statements" to establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wash.App. 736, 744, 87 P.3d 774 (2004) (citing Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 359, 753 P.2d 517 (1988)).
¶ 36 The Estate claims WSDOT breached its duty to maintain the intersection at North 170th Street and Aurora Avenue North in a condition that is reasonably safe for ordinary travel. The Estate argues that because studies showed the roving eyes device was successful in redirecting inattentive drivers, it would have prevented the accident.
¶ 37 In support, the Estate relies on Miller's opinion that "WSDOT should have activated the `roving eyes' display sooner," that "WSDOT should have used [push button] controls or other more reliable technology than pole mounted sensors," and "WSDOT could have placed a simple warning sign ... when the `roving eyes' were not activated." The Estate also argues that despite Cushing's statement that she was not looking and did not notice the cars stopped in the next lane, she would have noticed the roving eyes device because "it is unreasonable to argue that she could be going forward at approximately 40 [m.p.h.] without looking where she was going."
¶ 38 As to the City, the Estate contends that the City breached its duty to maintain its roads in reasonably safe condition for ordinary travel by failing to exercise its discretion to request and install a traditional traffic control signal utilizing pedestrian push button controls.
¶ 39 To establish negligence, the Estate must prove (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, and (3) injury proximately caused by the breach. Hansen v. Friend, 118 Wash.2d 476, 479, 824 P.2d 483 (1992).
¶ 40 There is no dispute that a municipality has a duty to exercise ordinary care to "build and maintain its roadways in a condition that is reasonably safe for ordinary travel." Keller v. City of Spokane, 146 Wash.2d 237, 249, 44 P.3d 845 (2002). To defeat summary judgment, a showing of proximate cause must be based on more than mere conjecture or speculation. Miller v. Likins, 109 Wash.App. 140, 145, 34 P.3d 835 (2001). It is well established that in order to hold a municipality liable for failure to provide a safe roadway, the plaintiff must establish "more than that the government's breach of duty might have caused the injury." Miller, 109 Wash.App. at 145, 34 P.3d 835.
¶ 41 There are two elements of proximate cause: cause in fact and legal causation. Hartley, 103 Wash.2d at 777, 698 P.2d 77. Cause in fact concerns the actual consequences of an act. On the other hand, legal causation is grounded in the determination of how far the consequences of a defendant's act should extend and focuses on whether the connection between the defendant's act and the result is too remote or inconsequential to impose liability. Hartley, 103 Wash.2d at 778-79, 698 P.2d 77.
¶ 42 Hartley illustrates the circumstances where as a matter of law, the State's liability for a car accident was "too remote and insubstantial to impose liability." Hartley, 103 Wash.2d at 784, 698 P.2d 77. In Hartley, Janet Hartley was killed when the car driven by Eugene Johnson crossed the center line and hit her car. Hartley, 103 Wash.2d at 770, 698 P.2d 77. Johnson was intoxicated at the time of the accident. Johnson had previously been arrested numerous times for drunk driving. Hartley, 103 Wash.2d at 770, 698 P.2d 77. The Estate filed a wrongful death action against the State for negligence in failing to revoke Johnson's license under the Washington Habitual Traffic Offenders Act. Hartley, 103 Wash.2d at 772, 698 P.2d 77. The court held that as a matter of law, the failure to revoke the intoxicated driver's license was too remote and insubstantial to impose liability. Hartley, 103 Wash.2d at 784, 698 P.2d 77.
¶ 43 Here, even assuming WSDOT breached its duty, as in Hartley, the Estate cannot show that any failure on the part of WSDOT to ensure the roving eyes device was properly *607 functioning was a proximate cause of the accident. Cushing did not notice any of the warning signs and visual clues as she approached the intersection, including the painted stop bar 40 feet before the crosswalk, the two-by-three-and-a-half-foot "Yield for Pedestrians" warning signs with arrows pointing at the stop bar, and the four-by-four-foot yellow pedestrian warning signs. There is also no dispute that Cushing was not looking ahead and was talking to her son who was sitting in the passenger seat. By her own admission, Cushing did not notice the three cars stopped in the outside lane to her right. The Estate's claim that WSDOT should have activated the roving eyes device sooner or installed different technology, and the argument that the roving eyes device would have prevented the collision, is based on speculation and as a matter of law is too attenuated to impose liability in this case.
¶ 44 Likewise, the negligence claim against the City fails. The Estate argues that the City was negligent because "the proper exercise of engineering discretion called for the installation of the more traditional traffic control signals." The record does not support the Estate's argument. The record shows that because the intersection did not meet the criteria for traffic control signals, the City had to request a permit to install traffic control signals at the intersection. There is nothing in the record showing that if the City had exercised its discretion to apply for a permit to install traditional traffic control signals, the permit would have been granted, or that if granted, the City could have obtained funding and installed the traffic control signals before the accident.
¶ 45 We affirm summary judgment dismissal of the claims against WSDOT and the City.
WE CONCUR: ELLINGTON and COX, JJ.
NOTES
[1] The accident was recorded by several surveillance cameras located on the exterior of Parker's Casino. The tape recordings from the cameras are consistent with the eye witness accounts and there is no factual dispute regarding the accident.
[2] The MUTCD outlines current applicable traffic engineering standards and compliance is a condition of federal grant funding.