# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| CHICAGO TITLE INSURANCE CO., a Washington corporation, | No. 69927-0-I |
| Plaintiff, | DIVISION ONE |
| v. | |
| RICHARD CAMPBELL and REBECCA LEE MARCY, husband and wife, and their marital community, | UNPUBLISHED |
| Appellants, | FILED: June 9, 2014 |
| and | |
| ROSALIND M. GREENBERG, an individual, | |
| Respondent. | |

COX, J. – Chicago Title Insurance Co. commenced this interpleader action and placed into the registry of the court an earnest money deposit held in escrow for a failed real estate transaction. On cross motions for summary judgment, the court awarded the deposit to the prospective buyer, Rosalind Greenberg. Because there were no genuine issues of material fact for trial, and the buyer was entitled to judgment as a matter of law, we affirm.

In April 2011, Greenberg and her terminally ill husband resided in Green Bay, Wisconsin. They decided to purchase a home for their daughter, Madeline, in the Puget Sound area. While Madeline and real estate agent Donna Cowles looked at properties, Greenberg remained in Wisconsin to be with her husband during his hospice care.

On April 26, 2011, Greenberg submitted a preapproval loan application to a Green Bay branch of Merrill Lynch. The Greenbergs had several investment and savings accounts at the branch. The loan application did not initially identify a specific property for purchase.

In late April, the Greenbergs made an offer to purchase a property in Redmond. That offer was not accepted. Shortly thereafter, the Greenbergs made a full price offer to buy for $370,000 the Kirkland residence of Richard Campbell and Rebecca Marcy ("Campbell").[1] That offer was accepted.

On May 1, 2011, the parties executed a purchase and sale agreement (PSA). The PSA provided for a closing date of June 8, 2011. A financing addendum stated in part:

> **1. DOWN PAYMENT / LOAN APPLICATION.**
> **a. Loan Application.** This Agreement is contingent on buyer obtaining the following loan or loans to purchase the Property. . . : . . . Conventional First . . . . Buyer agrees to pay . . . $170,000 down, in addition to the Loans and to make written application for the Loans to pay the balance of the Purchase Price and pay the application fee, if required, for the subject Property within 5 days . . . after mutual acceptance of this Agreement. . . .
> . . . .
>
> **4. EARNEST MONEY.** If Buyer . . . is unable to obtain financing after a good faith effort, then on Buyer's notice, this Agreement shall terminate. The Earnest Money shall be refunded to the Buyer after Buyer delivers to Seller written confirmation from Buyer's lender confirming (a) the date Buyer's loan application for the subject property was made; (b) that Buyer possessed sufficient funds to close; and (c) the reasons Buyer's application was denied.[2]

---

[1] We adopt the parties' naming conventions and refer to appellants as "Campbell" and respondent as "Greenberg."

[2] Clerk's Papers at 13.

Greenberg subsequently deposited $7,000 into escrow as earnest money.

In a declaration submitted below, Greenberg alleged she phoned Scott Mainard at Merrill Lynch on May 4, 2011, and informed him of the PSA.

On May 6, 2011, she exchanged e-mails with Mainard and requested a pre-approval letter. Mainard responded that the mortgage landscape had changed dramatically, that loan processing took longer than before, and that he would likely not have anything for her until the next week.

On May 17, 2011, Merrill Lynch issued a pre-approval letter stating that Greenberg was pre-approved for a mortgage loan of $148,000. An attached document entitled "Your Next Steps in the Financing Process" provided a checklist of steps Greenberg needed to take to complete the financing process. When asked about the checklist at her deposition, Greenberg said she received it when her husband's health "took a tremendous turn for the worse" and she "was giving up control of everything" to her agent and her financial advisor at Merrill Lynch. She added that she "didn't know there was anything else I needed to do other than wait for papers to come to me." Campbell points to nothing in the record showing that Merrill Lynch did not obtain whatever was required to approve the loan.

On May 23, 2011, following an inspection of Campbell's home, Greenberg negotiated a reduction in the purchase price to $341,000.

On June 1, 2011, Greenberg's agent requested an extension of the closing date by e-mail, stating that Merrill Lynch needed it to sell stock for the

down payment. Greenberg corroborated this in her declaration, alleging that Scott Mainard at Merrill Lynch asked for the extension of time.

On Friday, June 3, 2011, Greenberg's agent informed Campbell by e-mail that Merrill Lynch needed the extension "partly because of the way real estate is handled in [Wisconsin]. The bank was expecting to have 45 days after the inspection contingency was removed. They are working diligently on this and will keep us apprised of any changes in the closing date." Greenberg echoed the e-mail in her declaration, stating that Scott Mainard told her "it is standard practice in Wisconsin to have 45 days to close after the inspection contingency has been removed."

On June 3, 2011, Merrill Lynch employees stated in an internal e-mail that it was time "to turn this preapproval [of Greenberg's loan] into live registration." According to Campbell, this refers to the process of converting a general pre-approval into a property-specific loan application. There is nothing in this record showing that any delay in initiating live registration was due to acts or omissions of Greenberg.

On June 4, 2011, Greenberg's agent stated in an e-mail that Campbell had not signed an extension of the closing date and wanted "information about the progress of the loan which hasn't been started yet." Although Campbell suggests this shows that the loan process had not yet been started by Greenberg, this is mere speculation by him. The record plainly shows that Greenberg had started the loan application process.

On June 5, 2011, Campbell informed Greenberg's agent that he would not grant an extension without "a thorough understanding of the issues at hand and the resolutions going forward."

Internal Merrill Lynch documents show that it was actively processing the loan application during the final week before closing. Nothing in the documents indicates that Merrill Lynch's efforts were slowed by any omissions on Greenberg's part. Greenberg alleged below that she "worked furiously" to find another financing option, that she spoke with Ken Harding at Windemere Mortgage, and that she was unable to find any entity that could fund the loan by the closing date. She further alleged that "at all times our cash stores were adequate to fund the down payment on the property."

On June 8, 2011, Campbell offered to extend the closing date for an additional $10,000. Greenberg declined the offer and the sale did not close.

On June 9, 2011, Campbell informed Greenberg she was in default under the agreement and demanded that she forfeit the earnest money. Greenberg disagreed and declined to authorize release of the earnest money by Chicago Title.

On June 25, 2011, Greenberg's husband passed away.

On October 14, 2011, Chicago Title filed this interpleader action. The court subsequently granted Chicago Title's motion for discharge and the matter proceeded with Greenberg and Campbell asserting their respective claims to the fund.

Greenberg filed a cross claim against Campbell, alleging that "Campbell has refused to release the Earnest Money and is in breach of the Purchase and Sale Contract." Campbell also filed a cross claim. He alleged that Greenberg breached several terms of the real estate contract, including requirements for a loan application on the subject property within five days and an implied duty of good faith and fair dealing. Both parties moved for summary judgment.

In her motion, Greenberg argued that she was entitled to summary judgment because "Campbell does not have evidence that [she] defaulted under the [PSA]," she pursued financing in good faith, and the financing contingency in the agreement excused her from closing. In his response and counter-motion for summary judgment, Campbell argued that Greenberg's motion ignored her failure to obtain funds for a down payment, her failure to make a written application for a loan on the subject property within five days of mutual acceptance, alleged alterations to her loan application, and her failure to make a good faith effort to obtain financing. At the hearing on summary judgment, Campbell also argued that Greenberg had not acted in good faith because she failed to take any action on the checklist she received for finalizing her loan.

The superior court granted Greenberg's motion for summary judgment, stating in part:

> There's also no question that there was a prior offer made on an unrelated property, and under the facts before me, the application initially was made for that property.
> It is also clear from reviewing all of the facts that the intent of Ms. Greenberg was to change her loan application to the second

property, the Kirkland property of Mr. Kirkland (sic) -- excuse me -- of Mr. Campbell's and that she did everything she needed to do from Merrill Lynch's proposal and perspective to accomplish that change in address. And that's not unusual. She's getting preapproved, the amounts, the figures are very similar.

I understand the concern that Mr. Campbell makes, some suggestion of fraud. I simply can't find that there are any facts that support that. <u>I find that under the circumstances the burden is on Mr. Campbell to show -- there's no question that she didn't obtain financing, but then there's a burden on Mr. Campbell to show that for some reason that she didn't obtain financing because of some legal inability to follow through by Ms. Greenberg, that she did something improper.</u> And I don't find that she did, and I don't find that Mr. Campbell sustained the burden that she did anything other than what she was required to do by Merrill Lynch to continue with the case.

There is the suggestion that she -- on the second issue, on the down payment issue, there's a suggestion -- and I would say it's conjecture -- that she didn't have the funds to put $170,000 down, but we have her affidavit that she did as well as brokerage statements that suggest that she did as well.

And so I again find that Mr. Campbell did not sustain the burden to show that she didn't have the money to pay the $170,000 at the time that it was scheduled to initially close, which was that June 8th date.

So long story short, I do find that summary judgment in Ms. Greenberg's favor is appropriate.[3]

The court also awarded Greenberg $21,853 in attorney fees under an

attorney fee provision in the PSA. Campbell appeals.

## STANDARD OF REVIEW

The sole issue on appeal is whether the superior court erred in granting

summary judgment. We review that decision de novo, engaging in the same

---

[3] Report of Proceedings (Jan. 8, 2013) at 23-25 (emphasis added).

inquiry as the trial court.[4]

A party may move for summary judgment by pointing out the absence of evidence to support the opposing party's case.[5] If a party carries that initial burden, the burden then shifts to the opposing party to set forth specific facts showing a genuine issue of material fact for trial.[6] The nonmoving party may not rely on speculation or "mere allegations, denials, opinions, or conclusory statements" to establish a genuine issue of material fact.[7] Summary judgment is proper if the pleadings, affidavits, depositions, and admissions on file demonstrate that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law.[8] All reasonable inferences from the evidence must be drawn in favor of the nonmoving party.[9] Applying these principles here, we conclude the court did not err in granting summary judgment.

## BURDEN OF PROOF

Initially, the parties disagree on the applicable burden of proof. Greenberg correctly notes, and Campbell does not dispute, that a party moving for summary

---

[4] Dillon v. Seattle Deposition Reporters, LLC, 179 Wn. App. 41, 58-59, 316 P.3d 1119 (2014).

[5] Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989).

[6] Id. at 225.

[7] Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004).

[8] CR 56(c); Dillon, 179 Wn. App. at 59.

[9] Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 349, 588 P.2d 1346 (1979).

judgment can carry their initial burden by pointing out the absence of evidence supporting the opposing party's claim.[10] Greenberg moved for summary judgment on this basis below, arguing that Campbell had no evidence supporting his claim that she breached their agreement and that she was therefore entitled to the earnest money. The trial court adopted Greenberg's position, concluding that "there's a burden on Mr. Campbell to show that . . . she didn't obtain financing because . . . she did something improper."[11] For the first time in his reply brief, Campbell argues that this is not the appropriate burden of proof. We do not consider arguments raised for the first time in a reply brief.[12]

## GENUINE ISSUE OF MATERIAL FACT

Turning to the merits, Campbell contends the superior court erred in concluding there was no evidence supporting his claim that Greenberg breached the parties' agreement. He maintains there was evidence that she breached the contract in two respects.

First, he contends "Greenberg failed to make a good faith effort to obtain financing." He points out that "[t]here is in every contract an implied duty of good faith and fair dealing . . . ."[13] The duty "arises only in connection with terms agreed to by the parties."[14] This court has held that when, as here, a real estate

---

[10] Young, 112 Wn.2d at 225 n.1.

[11] Report of Proceedings (Jan. 8, 2013) at 24.

[12] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

[13] Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991).

[14] Id.; Johnson v. Yousoofian, 84 Wn. App. 755, 762, 930 P.2d 921 (1996).

contract makes third-party financing a condition of the duty to close, "[a] buyer has a duty to act in good faith to attempt to obtain third-party financing."[15]

It is undisputed that third-party financing was a condition precedent of Greenberg's duty to close. It is also undisputed that Greenberg applied for financing on April 26, 2011 and received a preapproval letter on May 17, 2011. Campbell argues the trial court erroneously focused on the April 26, 2011 application, that the application was "immaterial," and that the good faith issue actually turned on the May 17, 2011 preapproval letter and Greenberg's inaction thereafter. He contends an issue of fact exists whether Greenberg acted in good faith during that period.[16] He points out, as he did in summary fashion at oral argument below, that the checklist attached to the May 17, 2011 preapproval letter outlined the steps she needed to take for final approval of her loan. He contends Greenberg's inaction regarding the checklist, "coupled with the parallel lack of action at Merrill Lynch [and] the lack of documents or Merrill Lynch testimony . . . to prove otherwise," demonstrate a lack of good faith. We disagree.

---

[15] Salvo v. Thatcher, 128 Wn. App. 579, 585, 116 P.3d 1019 (2005).
[16] Although Campbell discusses several questions he raised below regarding the April 26, 2011 financing application, he does so to show the misplaced focus of the trial court. He concludes that the April 26, 2011 financing application is irrelevant and that Greenberg's breach occurred between May 17, 2011 and the closing date. Accordingly, we do not address the arguments relating to the April 26, 2011 application. We note, however, that these arguments also suffer from Campbell's erroneous view of the burden of proof.

As discussed above, it was Campbell's burden to provide evidence showing a breach of the duty of good faith. Although he contends Greenberg took no action on the loan checklist, she stated in her deposition that, due to her husband's illness, she had turned everything over to her agent and her financial advisor at Merrill Lynch. There is no evidence to show that anything needed by Merrill Lynch to process the loan was not timely provided, either by her, her agent, or her financial advisor. Campbell also fails to discuss the specific matters on the list and provides no evidence that they were in any way related to Merrill Lynch's failure to fund the loan by the closing date. Likewise, he provides no evidence supporting his claim that there was a "parallel lack of action at Merrill Lynch" between May 17th and early June. Even if such evidence existed, there is no evidence that Merrill Lynch's lack of action was caused by any action or omission by Greenberg.

On the other hand, there is unrebutted evidence that the delay in processing the loan was not Greenberg's fault. On June 01, 2011, Greenberg's agent stated in an e-mail to Campbell that the lender needed an extension of the closing date in order to sell stock for the down payment. Two days later, she explained to Campbell that the extension was also due to "the way real estate is handled in [Wisconsin]. The bank was expecting to have 45 days after the inspection contingency was removed. They are working diligently on this and will keep us apprised of any changes in the closing date."

In addition, Greenberg's actions in June showed good faith efforts to obtain financing. When it became apparent that Merrill Lynch could not fund the loan by the closing date, Greenberg did not terminate the agreement but instead sought an extension of the closing date to finalize the loan. She also pursued alternative financing.

In sum, Campbell failed to produce evidence demonstrating a genuine issue of fact whether Greenberg breached her duty to pursue financing in good faith.[17]

Second, Campbell contends Greenberg's failure to tender the down payment fund breached the PSA. But tender of the down payment was excused under the agreement if financing was unavailable.[18] And while Greenberg's efforts to procure a down payment are relevant to the question of her good faith, Campbell points to nothing showing that Greenberg did not make good faith efforts to obtain the down payment. Instead, he simply argues that Greenberg came forth with no evidence showing that she made good faith efforts to procure the down payment by the closing date. But as discussed above, the burden was

---

[17] Campbell argues in passing that "[t]he trial court erred in allowing admission of the alleged May 4th application" because "it is considered a 'lost instrument.'" App. Br. at 31. This argument apparently refers to Greenberg's claim that she notified Merrill Lynch on May 4th that her prior financing application now applied to the offer she made on Campbell's property. This argument appears to be made for the first time on appeal and, in any event, is too conclusory to merit discussion. RAP 2.5(a); MP Medical Inc. v. Wegman, 151 Wn. App. 409, 420-21, 213 P.3d 931 (2009).

[18] See Salvo, 128 Wn. App. at 586.

on Campbell to demonstrate Greenberg's lack of good faith.

Campbell fails to demonstrate a genuine issue of fact. Greenberg was entitled to judgment as a matter of law. The superior court properly granted Greenberg's motion for summary judgment. And Greenberg was entitled to an award of her attorney fees and expenses under the "prevailing party" provision in the PSA.

Likewise, Greenberg is entitled to reasonable fees and expenses under that provision on appeal, subject to her compliance with RAP 18.1.

We affirm the order on summary judgment and award fees on appeal to Greenberg.

_____
Cox, J.

WE CONCUR:

_____
Dwyer, J.

_____
Becker, J.

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2014 JUN -9 AM 10: 24